IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SALVATORE CHIMENTI, | : | |
|     Petitioner | : | |
| | : | |
|     v. | : | No. 98-cv-6151 |
| | : | |
| KENNETH EASON, et al., | : | |
|     Respondents | : | |

**RESPONSE TO PETITIONER'S MOTION FOR RELIEF
FROM FINAL JUDGMENT PURSUANT TO FED. R. CIV. P. 60(B)**

    Salvatore Chimenti does not dispute that he killed Andrew Tucker, and he has spent nearly four decades incarcerated as a result of his crime. At the time of his trial, the Commonwealth believed it would be difficult to obtain a conviction for first-degree murder as Chimenti had a colorable claim of self-defense. But Chimenti's trial counsel perpetrated an ill-conceived scheme to present perjured testimony, and the perjury was almost immediately exposed. As a result, Chimenti's self-defense claim was discredited, and he was convicted of first-degree murder and sentenced to life imprisonment without the possibility of parole. Trial counsel's conduct was unreasonable and resulted in Chimenti's conviction for a crime that likely exceeded his culpability.

    Shortly after Chimenti's trial, the District Attorney's Office (DAO) investigated his trial counsel's conduct and confirmed Chimenti's claim. But a change of administrations brought with it a change in approach to Chimenti's case, and the

Commonwealth opposed relief during his state and federal collateral review. Although the DAO had issued relevant witnesses unconditional promises of non-prosecution, it later misrepresented the scope and validity of those promises. If not for those misrepresentations, Chimenti would have been able to prove his claim. Because his claim of ineffective assistance of counsel is meritorious and because the Commonwealth's prior conduct in this case prevented this Court from ruling based upon a full evidentiary record, the Commonwealth Respondents do not oppose *Petitioner's Motion for Relief from Final Judgment Pursuant to Fed. R. Civ. P. 60(b)* ("Rule 60(b) Motion"). He is entitled to relief in the form of a new trial.

## I. Background.

On November 23, 1998, Chimenti filed a petition for a writ of habeas corpus with this Court. The matter was assigned to District Judge Clifford Scott Green, who in turn referred it to Magistrate Judge Arnold C. Rapoport for a Report and Recommendation ("R&R"). On January 10, 2000, Judge Rapoport issued his R&R and recounted the facts and history of this case as follows.

> On May 10, 1982 at approximately 11:30 P.M. the petitioner fatally wounded Andrew Tucker in front of the petitioner's mother's home. The petitioner arrived, finding his brother Mario and friend Michael Cavanaugh there, as well as Tucker, who was with Robert Harris and Walter Schiffler. There was a history of animosity between the petitioner and Tucker. After a brief shouting match, the petitioner took the .38 caliber revolver out of his pants and began shooting at Tucker, who was hit seven times—thrice in the chest, once in the groin and thrice in his back. Mario Chimenti took out his .22 caliber gun and fired four shots at the victim, hitting him once. Tucker collapsed on the street, Harris fled to the car and drove off with Schiffler, who had remained in the car. The petitioner and his cohorts fled the scene. On June 2, 1982 the petitioner surrendered to police, accompanied by [his attorney, Joel] Moldovsky.
>
> There was testimony that the petitioner had threatened Robert Harris's sister Elizabeth (Cookie), that if Harris testified, the petitioner

would "blow them away". Robert Harris did, however, contact an attorney and make a statement to the police.

Jury selection began on April 27, 1983 before Judge [Lisa] Richette, with Assistant District Attorney John DiDonato representing the Commonwealth. Two days later DiDonato interviewed Cookie Harris, who told DiDonato that she and a friend were approached by Gregory Spain at a local bar. After accompanying Spain to his apartment for liquor and cocaine, Spain told her that he was going to be a witness at the trial, testifying that he had been present at the shooting and seen Tucker with a gun, even though he had not been at the scene. He stated that because he was black, his testimony would have greater credibility with black jurors. DiDonato did not inform Judge Richette that the defense planned to offer perjured testimony at trial.

The evidence reveals that there were two eyewitnesses to the incident—Maria Convery and Frank Cioffi—who were walking down the street near the Chimenti home when they heard the loud and angry exchange between the petitioner and the victim. They crossed the street to avoid the confrontation, and heard the shots, saw the Chimenti brothers run into their mother's house, and saw Harris flee. They watched Tucker stagger across the sidewalk and collapse against a parked car. They went to Tucker to see if they could help him.

In a statement to police on May 11, 1982 (the day after the murder), Convery stated that as she reached for a jacket lying near the victim to pillow his head, she noticed a revolver lying close by. This observation was confirmed by Cioffi in a separate statement made the same day.

Officer Harley testified that Tucker was lying in the street next to a green station wagon parked at the curb, with a gun lying beside Tucker's left side near the leg. He said that there was blood on the gun but that it was not lying in blood.

At trial Robert Harris and Schiffler testified that Tucker was unarmed. The petitioner testified that the shooting was self-defense because Tucker was armed and shouting threats at him.

The defense presented the testimony of Gregory Spain. As predicted, Spain testified that he drove the petitioner and a woman to the Chimenti home, and stayed in the car when he saw Tucker come down the street yelling, his arm wrapped in a jacket. Spain said that, just as Tucker and Harris went up the steps to the porch of the

Chimenti home, he saw the barrel of a gun in Tucker's hand. He stated that he left the scene immediately after the shooting.

On cross-examination DiDonato asked Spain whether he met Cookie Harris and her friend in a bar, took them to his house, and told them that he was going to commit perjury by saying that he was at the scene when he was not. Spain testified that he did meet Cookie Harris, but did not say anything about committing perjury. In rebuttal, DiDonato presented Detective Brignola, who was present at the April 29, 1983 interview with Cookie Harris. At one point in the examination, DiDonato read from his notes of the meeting and stated his impressions to the court. At no time did defense counsel Moldovsky object to this exchange. Nor did Moldovsky call true eyewitnesses Convery and Cioffi.

Post-trial, the petitioner retained Michael M. Mustokoff, Esquire, who launched an investigation into the petitioner's allegations of perjury. He took the results of his investigation to the District Attorney, who conducted its own investigation. As noted above, as a result of these investigations, the petitioner and the Commonwealth entered into an agreement executed on July 9, 1984. Under the terms of this agreement:

1. The petitioner would proceed to sentencing before Judge Richette;

2. The petitioner reserved his right to litigate his claim of ineffective assistance of counsel Moldovsky;

3. Petitioner's counsel would present evidence of subordination of perjury;

4. Litigation of this claim would be deferred at the request of the District Attorney so as not to interfere with the criminal investigation of the perjury;

5. The District Attorney agreed that regardless of the outcome of its investigation, the petitioner would be able to litigate his ineffectiveness claim;

6. If the District Attorney's investigation did not support the petitioner's allegations, the parties would get a remand from the Superior Court, and the petitioner would file a PCRA action on the issue of ineffectiveness of counsel due to the subornation of perjury, which would not be opposed by the Commonwealth. The PCRA petition would be presented to the President Judge of the Philadelphia Court of Common Pleas for the appointment of a

    judge not previously involved in the case to hear the ineffectiveness claim;

    7. If the District Attorney's investigation determined that there was subornation of perjury, the petitioner would enter a guilty plea as follows: a. a judge with no previous connection with this case would grant the petitioner's PCRA petition provided he agreed to co-operate fully with the District Attorney in any action brought as a result of the investigation; b. this agreement would be effectuated by the filing of an uncontested PCRA action on the grounds of ineffectiveness of counsel due to subornation of perjury, and the petitioner would plead guilty, the parties would obtain a remand from the Superior Court, after which the previous sentence imposed by Judge Richette would be vacated and the plea entered; c. the petitioner would plead guilty to murder generally, and the District Attorney would certify that the crime rose to no higher than third degree murder, allowing the guilty plea judge to find the petitioner guilty of third degree murder or voluntary manslaughter; e. (sic) the petitioner would co-operate fully with the District Attorney; f. sentence might be deferred pending the outcome of litigation in connection with the perjury investigation; g. the petitioner would have the right to seek bail, but any request would be opposed by the District Attorney; h. the District Attorney's position regarding a recommendation at sentencing would depend on the petitioner's truthful co-operation; and i. to the extent that it could be provided for by the parties, the petitioner shall serve his sentence at Rockview Prison.

Rather than proceed through the procedure prescribed in the agreement, the parties signed a Joint Petition for Remand, which was filed with the Superior Court on March 15, 1985. After an in camera hearing due to the confidential nature of the allegations, Judge Spaeth signed the remand order. As noted above, after learning of the remand order, but without knowing the rationale behind it, Judge Richette filed a Petition for review in the Nature of Prohibition in the Supreme Court. Exercising its plenary jurisdiction, the Supreme Court ordered all parties to brief the issue of the Superior Court's power to entertain a plea bargain after the entry of a judgment of sentence. Neither the co-operation agreement nor the nature of the suspected perjury were [discussed] in the Supreme Court proceeding. The Supreme Court ruled that Judge Spaeth exceeded his authority in granting the Joint Petition for remand, and ordered the petitioner's appeal to proceed.

The petitioner's fourth attorney, Paul Schechtman, Esquire, moved the Superior Court to remand the matter to the Court of Common

Pleas for the purpose of placing evidence of the perjury on the record, which had not been done previously under the terms of the co-operation agreement. The Commonwealth did not oppose the motion; however, it was denied by the Superior Court, which did allow Schechtman to argue the issue in a brief and orally. Schechtman filed his brief on July 15, 1986.

On October 6, 1986 Assistant District Attorney Marianne Cox telephoned Schechtman and informed him that the Commonwealth considered the co-operation agreement to be null and void, and would oppose any relief sought by the petitioner. Schechtman sent a letter to District Attorney Ronald Castille requesting verification, which he received in a letter from Castille dated October 24, 1986, in which Castille stated he did not intend to reverse his position.

The Commonwealth opposed the petitioner's request for relief in his direct appeal, and the Superior Court affirmed the judgment of sentence. The superior court panel refused to consider the arguments made by Schechtman regarding the ineffectiveness claims and the perjury because the evidence was not in the official record. The petitioner's petition for *allocatur* was denied.

On September 18, 1990 the petitioner sought collateral relief, alleging ineffective assistance of counsel in suborning perjury and failing to call Convery and Cioffi as witnesses, ineffectiveness of all prior counsel, and requesting specific performance of the co-operation agreement.

In his brief in support of this petition, Chimenti alleges that during the course of the PCRA proceeding, he was prevented from presenting evidence in support of his claims due to the refusal of the District Attorney's office to disclose evidence, and by the PCRA court's allowing the Commonwealth to invoke the Fifth Amendment privilege of its witnesses without those witnesses appearing in court. The PCRA also prevented the petitioner from presenting evidence of Moldovsky's ineffectiveness by declaring that issue previously litigated, and not subject to collateral relief.

An evidentiary hearing was held on October 27, 1992 at which only Mustokoff testified. On June 20, 1995 the PCRA petition was denied. The superior court upheld the PCRA court, and the Supreme Court denied *allocatur* on November 26, 1997.

*Report and Recommendation*, Docket No. 10, (Jan. 10, 2000).

Among other things, the Commonwealth argued in Chimenti's PCRA proceedings that because the Pennsylvania Supreme Court had previously rejected its agreement with Chimenti, any offer of immunity the DAO had extended to Chimenti, Spain, and any other witnesses to the perjury scheme was also nullified. N.T. 11/15/1993 at 15-16 (Exhibit F). The defense did not have copies of any written promises of immunity or non-prosecution, and the Commonwealth denied that the offers had ever been reduced to writing. N.T. 11/15/1993 at 3 (defense counsel explained that he could not provide the witnesses with "statements that the DA's office may have that I don't and a copy of the immunity agreement"); *id.* at 5 (prosecutor explaining that "There were apparently discussion—maybe not written discussions—between the Commonwealth and between defense counsel that the Commonwealth may have been willing to give immunity had any of these people testified[,] but no formal immunity was ever granted to any of them."). The PCRA Court accepted the Commonwealth's representations regarding the scope and validity of the immunity agreements, and the relevant witnesses refused to testify in the PCRA proceedings, and Chimenti was unable to demonstrate that his trial counsel was ineffective.

Judge Rapoport recommended an evidentiary hearing on Chimenti's claim because he was prevented from developing the factual basis of his claims in state court. *Chimenti v. Frank*, No. CIV. A. 98-6151, 2001 WL 21496, at *1 (E.D. Pa. Jan. 9, 2001). The Court adopted the factual and procedural history set forth in the R&R and held an evidentiary hearing at which Cioffi and Convery testified regarding their accounts. Moldovsky was questioned about the perjury, but none of the

other witnesses relevant to the issue was able to testify without further implicating themselves and facing potential criminal charges.

> The Court ultimately rejected Chimenti's claim, reasoning as follows:
>
> At [the] hearing, Petitioner's trial counsel testified that he did not "suborn perjury." He also testified that he made a tactical decision not to call Cioffi and Convery, because their testimony would contradict Petitioner's sworn testimony and defense strategy. During the course of the hearing, Petitioner failed to offer any evidence that his trial counsel suborned perjury. Nor was there any evidence that Petitioner's own testimony, which was consistent with the alleged perjured testimony, was the result of counsel overcoming Petitioner's will. There was also no evidence that trial counsel was ineffective for failing to call Cioffi and Convery as witnesses. Moreover, Petitioner failed to demonstrate that he was prejudiced by his trial counsel's alleged deficiencies.

*Id.* at *4. Chimenti's habeas petition was denied, and neither this Court nor the Court of Appeals issued a certificate of appealability.

## II.     Recent events.

At Chimenti's request,[1] the Conviction Integrity Unit ("CIU") of the Philadelphia District Attorney's Office ("DAO") undertook an evaluation of Chimenti's first-degree murder conviction and life sentence, including a comprehensive review

---

[1] In March 2015, Chimenti requested that his conviction be reviewed by the DAO's Conviction Review Unit ("CRU"), a unit that operated differently from the current CIU. After some investigation and multiple levels of internal review, the CRU recommended that the DAO support relief in this case, but District Attorney Kelly Hodge disapproved of relief. Although no reason was memorialized, many conviction review units categorically exclude self-defenses cases. The ADA investigating Chimenti's case, Andrew Wellbrock, Esq., continued his investigation as a member of the CIU in 2018.

8

of the files archived by the DAO and interviews of relevant witnesses.[2] The Commonwealth's records reflected internal discord regarding the propriety of contesting his petition, not only in light of the original agreement but because his claim appeared to be factually and legally sound.

**A. The Commonwealth's prior positions on Chimenti's claim.**

In its 1985 brief to the Pennsylvania Supreme Court, the Commonwealth argued in support of the Superior Court's order vacating Chimenti's conviction. Exhibit Among other things, it noted that the DAO's investigation into Chimenti's perjury claims had been completed and that it had "determined that [Chimenti's] information was reliable." *In re: Commonwealth v. Chimenti*, Commonwealth Br. at 10 (Exhibit C). It also "evaluated the evidence which supported [Chimenti's] first degree murder conviction" and determined that it would have been unable to rebut Chimenti's self-defense claim beyond a reasonable doubt. *Id.* at 7-8; 8 n.4. The Commonwealth recognized that the first-degree conviction it had obtained was the direct result of trial counsel's perjury scheme:

> The Commonwealth countered defendant's self-defense evidence by theorizing that the gun found by Tucker's body had been "planted" there by defendant or his friends. Although the Commonwealth was unable directly to disprove defendant's claim that Tucker was armed when defendant shot him, it was able directly to prove that at least one defense witness had consciously lied. Having seen the defense testimony belied, the jury convicted defendant of first degree murder.

---

[2] The DAO files include the trial file, transcripts, records of an extensive post-trial investigation, internal memoranda, legal research in support of the agreed-upon relief and the possible prosecution of Chimenti's trial counsel, correspondence with the Office of the Attorney General, and all of the post-trial filings in the case. Pursuant to a discovery and cooperation agreement with Chimenti's counsel, all of these records were made available as part of open-file discovery.

9

*Id.* at 5; *see also id.* at 8 n.4.

While the case pending before the Supreme Court, a new District Attorney, Ronald Castille, was sworn in who took a different tack. The DAO could have reiterated these positions during subsequent proceedings and conceded that Chimenti had received ineffective assistance of counsel, but the new District Attorney instead believed that the Commonwealth should defend conviction for first-degree murder. He referred the case to the Office of the Attorney General (OAG) because, among other reasons, he perceived a conflict in this office's ability to defend the conviction in the Superior Court given the earlier agreement and stated position on the case. *See* April 24, 1986 Letter from District Attorney Ronald Castille to Attorney General LeRoy Zimmerman (Exhibit D).

In June of 1986, the OAG declined to assume jurisdiction, stating that no conflict existed:

> "Though normally at a hearing contesting the effectiveness of counsel the Commonwealth attempts to sustain a conviction by showing that counsel acted appropriately under the circumstances, that is not required. Our job as prosecutors . . . is not merely to obtain (or sustain) convictions, but to see that justice is done. If your internal investigation has disclosed the ineffectiveness of trial counsel, you are duty bound to assist the court in making an appropriate disposition of the case."

June 10, 1986 Letter from Deputy Attorney General Robert Keuch to District Attorney Ronald Castille at 1-2 (Exhibit E). Seemingly stating the obvious, the OAG remarked that "[i]f the law or the facts of this case were against the Commonwealth, there would be nothing to prohibit you from so advising the Court and conceding error." *Id*. at 2.

10

### B. Facts disclosed during the CIU investigation.

During its review of the prosecution's files relating to Chimenti's case, the CIU located copies of letters to Chimenti and his witnesses confirming that then-District Attorney Edward Rendell had made unconditional promises of non-prosecution and immunity:

> You are advised that any statement or testimony you give regarding the commission of the crime of perjury by you or others during the course of the homicide trial against Salvatore Chimenti from April 27 to May 18, 1983 for the killing of Andrew Tucker will not be used against you in any criminal proceeding regarding the crime of perjury or solicitation to commit perjury. You are further advised that this office will grant you immunity from prosecution for the crimes of perjury and solicitation to commit perjury which crimes may have been committed during the course of the above mentioned 1983 trial.
>
> Sincerely,
>
> *Edward G Rendell*
>
> EDWARD G. RENDELL

*Figure 1: Excerpt of May 24, 1984 immunity letter to Gregory Spain, Ex. B*

The letters confirmed that the DAO's promises were not predicated on its agreement with Chimenti, nor were they limited to the investigation of Chimenti's allegations.

The CIU also found records confirming that the DAO had substantiated Chimenti's claims in 1984 by interviewing relevant (immunized) witnesses as well as records of polygraph examinations. Subsequent administrations ignored the fruits of that investigation and declined to independently verify Chimenti's claims by re-interviewing the relevant witnesses without the threat of further prosecution; instead the Commonwealth defended this conviction. The DAO's position was that

Chimenti would have to prove his perjury claim in court, but any witness admitting to perjury at his trial would face criminal charges.

### C. The successor PCRA petition.

In 2018, the CIU informed Chimenti of its conclusions and, for the first time, provided him with copies of the immunity letters contained in its files. Based on those disclosures, Chimenti filed a successor PCRA petition presenting his ineffective assistance claim once again—this with the full support of the DAO. The CIU stipulated to Chimenti's factual recitation and agreed that relief was warranted. Nevertheless, the PCRA Court held that the petition was untimely and that his claims were barred as previously litigated. 1925(b) Opinion (Exhibit I). The Superior Court affirmed, characterizing the Commonwealth's position as agreeing that Chimenti was entitled to relief because "its predecessors breached the agreement, and thus Appellant is entitled to PCRA relief." *Commonwealth v. Chimenti*, 218 A.3d 963, 975–76 (Pa. Super. 2019).[3] The Pennsylvania Supreme Court denied his unopposed allocator petition on April 14, 2020. *Commonwealth v. Chimenti*, 229 A.3d 565 (Pa. 2020) (table).

---

[3] The Commonwealth's position in those proceedings—as it is in these—was that Chimenti is entitled to relief because his right to the effective assistance of counsel was violated. *See* Commonwealth's Br. at Appellee at 16 ("[T]he Commonwealth urged the PCRA Court to grant Chimenti relief because it believes the record established that his right to the effective assistance of counsel was violated, not to satisfy any agreement reached between the parties.") (Exhibit K). While the Commonwealth does not ignore that the equities obviously weigh in favor of effectuating the agreement made with the defendant decades ago, that is not the reason he is entitled to relief. The recitation serves only to explain why relief is warranted *now* despite its postponement and subsequent denial in earlier litigation.

Chimenti, represented by new counsel, filed the instant Rule 60(b) Motion in October 2021. As it did in the state proceedings, the Commonwealth concurs in and stipulates to the factual recitation in that Motion.

### III.  Relief from judgment is appropriate.

This matter is properly before the Court as it is a "true" motion under Rule 60(b) and not a second or successive petition. A 60(b) motion that advances one or more claims or attacks the federal court's previous resolution of a claim on the merits should generally be construed as a second or successive habeas petition. *Gonzalez*, 545 U.S. at 532. However, a Rule 60(b) motion that "attacks, not the substance of the federal court's resolution of a claim on the merits, but some defect in the integrity of the federal habeas proceedings," is not. *Id.* The *Gonzalez* court noted that fraud on the federal habeas court is an example of such a defect. *Id.* at n.5 (citing *Rodriguez v. Mitchell*, 252 F.3d 191, 199 (2d Cir. 2001) (a witness's allegedly fraudulent basis for refusing to appear at a federal habeas hearing "relate[d] to the integrity of the federal habeas proceeding, not to the integrity of the state criminal trial")). Here, the Commonwealth's refusal to honor its immunity agreements—or even acknowledge their existence and scope—prevented the Court from making a merits ruling based on a complete record including the testimony of the participants in trial counsel's perjury scheme. The DAO's prior conduct impinged the integrity of the prior proceedings, and the Commonwealth therefore agrees that Chimenti's Rule 60(b) Motion is properly before the Court.[4]

---

[4] The state court's rejection of Chimenti's ineffective assistance claim—likewise based upon his inability to fully and fairly present his case—should not bind this Court. *Cf. Rolan v. Vaughn*, 445 F.3d 671, 679 (3d Cir. 2006) "[s]tate fact-finding

13

The Commonwealth also believes that 60(b) relief is appropriate. "Rule 60(b) provides litigants with a mechanism by which they may obtain relief from a final judgment 'under a limited set of circumstances including fraud, mistake, and newly discovered evidence.'" *Satterfield v. Dist. Att'y Philadelphia*, 872 F.3d 152, 158 (3d Cir. 2017) (quoting *Gonzalez v. Crosby*, 545 U.S. 524, 528 (2005)). Relief under Rule 60(b)(6), upon which Chimenti relies, is available in "extraordinary circumstances where, without such relief, an extreme and unexpected hardship would occur." *Id.* (quotation marks omitted). Rule 60(b) requires courts to consider the totality of the relevant circumstances in determining whether to set aside a final judgment. *Cox v. Horn*, 757 F.3d 113, 122 (3d Cir. 2014) (noting that the Third Circuit Court has "long employed a flexible, multifactor approach to Rule 60(b)(6) motions . . . that takes into account all the particulars of a movant's case."); *see also Ungar v. Palestine Liberation Org.*, 599 F.3d 79, 83-84 (1st Cir. 2010) (the "decision to grant or deny [Rule 60(b)(6)] relief is inherently equitable in nature," and requires "a holistic appraisal of the circumstances" for which "hard-and-fast rules generally are not compatible").

Here, 60(b) relief is warranted chiefly for two reasons: because his claim is meritorious and because he would have been able to demonstrate the merits of his claim in his initial habeas proceedings but for the Commonwealth's interference.

---

procedures may be relevant when deciding whether [a] determination was 'reasonable' or whether a petitioner has adequately rebutted a fact" (citing *Lambert v.Blackwell*, 387 F.3d 210, 239 (3d Cir. 2004)); 28 U.S.C. § 2254(f) (permitting challenge to sufficiency of evidence in support of state court's factual determinations).

### A. Trial counsel's unreasonable choice to suborn the perjury of multiple witnesses constituted ineffective assistance.

It is beyond cavil that intentionally crafting and presenting a perjured defense cannot be a reasonable strategic choice. Simply put, it can never be reasonable for an attorney to present false testimony as it interferes with the truth-seeking function of the trial. Indeed, the Supreme Court has defined ineffective assistance of counsel in terms of its effect on the reliability of a trial's result; there can be no argument that presenting false testimony undermines a trial's reliability. *Strickland v. Washington*, 466 U.S. 668, 687 (1984) (ineffective assistance of counsel occurs where there is "a breakdown in the adversary process that renders the result unreliable"). Here, it was unreasonable for counsel to forego a legitimate defense in favor of suborning the perjury of multiple witnesses.

As the Commonwealth initially conceded before the Pennsylvania Supreme Court, trial counsel's unreasonable conduct was prejudicial. Chimenti had a colorable self-defense claim as the police recovered a gun near the decedent's body. At trial, the Commonwealth claimed that the gun could have been planted, though no evidence supported this theory. But the only evidence corroborating Chimenti's self-defense claim came from witnesses revealed to be perjuring themselves, leaving the Commonwealth's theory effectively unrebutted and seeming comparatively credible. If trial counsel had called Convery and Cioffi instead of presenting perjured testimony, the jury would have seen an entirely different picture of the killing. Even if the jury rejected a self-defense claim, Chimenti likely would have been convicted of, at most, third-degree murder and acquitted of first-degree murder. If so, he would have been subject to an aggregate statutory maximum sentence of 12.5

15

to 25 years and would have been released from custody over a decade ago. The Commonwealth therefore agrees that trial counsel's conduct amounted to ineffective assistance of counsel in violations of Chimenti's rights under the United States and Pennsylvania constitutions.

### B. The Commonwealth interfered with Chimenti's ability to present his claim of ineffective assistance.

The Commonwealth promised Chimenti's witnesses immunity from prosecution if they testified truthfully regarding his trial counsel's perjury scheme. But it argued in Chimenti's prior proceedings that because the Pennsylvania Supreme Court had previously rejected its agreement with Chimenti, the offers of immunity the DAO had extended to critical witnesses were also nullified. N.T. 11/15/1993 at 15-16. The Commonwealth also argued that the immunity offers "only went to the investigation nine years ago and not to [the PCRA proceedings]." N.T. 11/17/1993 at 80. Neither of these arguments was true.

First, the Pennsylvania Supreme Court did not address any promises of immunity in its decision rejecting the Commonwealth's agreement. Rather, it was focused on the propriety of the Superior Court's remand order directing that the lower court accept a plea to third-degree murder. It vacated that order for two reasons: because it reduced the lower court's role in the plea process to a "rubber stamp" and because it "abrogated a jury verdict without any semblance of a record." *Commonwealth v. Chimenti*, 507 A.2d 79, 83 (Pa. 1986). Neither of these concerns had anything to do with the issue of witness immunity—indeed, the provision of immunity was required precisely to create the sort of record the Pennsylvania Supreme Court required.

Second, the promised immunity was not limited to the investigation. In letters from then-District Attorney Edward Rendell, the witnesses were informed that "any statement or testimony you give regarding the commission of the crime of perjury [at Chimenti's trial] will not be used against you in any criminal proceeding regarding the crime of perjury or solicitation to commit perjury" and that "this office will grant you immunity from prosecution for the crimes of perjury and solicitation to commit perjury [at trial]." (Exhibit B).

The Commonwealth misrepresented the scope and validity of the DAO's promise of non-prosecution, and prevented Chimenti from presenting testimony from the other participants in the perjury scheme. *See Chimenti v. Frank,* No. CIV. A. 98-6151, 2001 WL 21496, at *4. Chimenti was unable to rebut those misrepresentations because the Commonwealth did not disclose the letters to the defense or acknowledge their existence.

The Pennsylvania Supreme Court has recently stressed the importance of enforcing promises of immunity. *Commonwealth v. Cosby*, 252 A.3d 1092, 1131, (Pa. 2021), *cert. denied*, No. 21-793, 2022 WL 660639 (U.S. Mar. 7, 2022) ("As prosecutors are vested with such 'tremendous' discretion and authority, our law has long recognized the special weight that must be accorded to their assurances."). There, as here, one elected District Attorney made "an unconditional promise of non-prosecution" that Bill Cosby would not be prosecuted based upon testimony he was expected to provide in other proceedings. *Id.* at 1099–100. After Cosby testified in reliance on that promise, a subsequent administration of the District Attor-

ney's Office reneged on the commitment and prosecuted him based upon his testimony. *Id.* The Pennsylvania Supreme Court held that "when a prosecutor makes an unconditional promise of non-prosecution, and when the defendant relies upon that guarantee to the detriment of his constitutional right not to testify, the principle of fundamental fairness that undergirds due process of law in our criminal justice system demands that the promise be enforced." *Id.* at 1131. As a result, Cosby's conviction was vacated. *Id.* at 1147.

The same situation occurred here. Chimenti's witnesses were given unconditional promises of non-prosecution for "any statement or testimony" given regarding the perjury at his trial. (Exhibit B). They were entitled to rely on those promises. Because they were entitled to immunity, they had no valid Fifth Amendment claim and could have been compelled to testify about the perjury scheme. The DAO's misrepresentations and refusal to honor its own guarantees of immunity prevented them from doing so.

The Commonwealth concurs with Chimenti that its prior conduct prevented him from fairly litigating his claim. It simultaneously frustrated his efforts to present evidence the DAO had already determined was reliable and argued that relief was foreclosed because he had not proved his claim. The Commonwealth's false representations regarding the scope and enforceability of its promises of non-prosecution violated his right to due process. *Cf. Napue v. People of State of Ill.*, 360 U.S. 264, 269 (1959); *see also* Pa. R. Prof. Conduct 3.3 (prohibiting lawyers from making "false statement[s] of material fact or law to a tribunal" or failing to correct prior false statements). But for that unlawful interference, Chimenti would have

been able to develop his claim in his original, timely PCRA and federal habeas proceedings. Because the Commonwealth's conduct affected the integrity of this Court's proceedings in the initial habeas proceedings, the Commonwealth will not oppose relief under Rule 60(b).

IV.     **Conclusion.**

The CIU's investigation disclosed that Chimenti's trial counsel was ineffective and likely resulted in Chimenti being convicted for a crime that exceeded his actual culpability. Although the Commonwealth was aware of trial counsel's misconduct and understood that it constituted ineffective assistance of counsel, the Commonwealth interfered with Chimenti's ability to develop this claim. In light of the foregoing, the Commonwealth does not oppose Chimenti's Rule 60(b) Motion and agrees that relief is warranted in the form of a new trial.

Respectfully submitted,

*/s/Thomas Gaeta*
THOMAS GAETA
Assistant District Attorney
Conviction Integrity Unit

*/s/M Garmisa*
MICHAEL GARMISA
Assistant District Attorney
Supervisor
Conviction Integrity Unit